UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
DAVE LENARTZ, PLUMBERS AND      )
PIPEFITTERS NATIONAL PENSION FUND,  )
JEANNE V. FOSTER, KEITH CHUN,   )
PHILIP H. GRIFFIN, KENNETH GODT,  )
NORFOLK COUNTY RETIREMENT SYSTEM,  )
L.A. MURPHY, STEAMSHIP TRADE    )
ASSOCIATION/INTERNATIONAL       )
LONGSHOREMEN'S PENSION BENEFIT FUND,  )
JIAN XIAO, PROFITS ONLY LLC,    )
                                )
                Plaintiffs,     )
                                )
        v.                      )    CIVIL ACTION
                                )    NO. 11-10582-WGY
AMERICAN SUPERCONDUCTOR CORPORATION,  )
VIKRAM S. BUDHRAJA, PETER O. CRISP,  )
RICHARD DROUIN, DAVID R. OLIVER,  )
JR., JOHN B. VANDER SANDE, JOHN W.  )
WOOD, JR., DANIEL MCGAHN, MORGAN  )
STANLEY & CO., INC., DEUTSCHE BANK  )
SECURITIES INC., JEFFERIES & CO.,  )
GREGORY J. YUREK, DAVID A. HENRY,  )
                                )
                Defendants.     )
_____)
```

MEMORANDUM & ORDER

YOUNG, D.J.                                        July 26, 2012

## I.   INTRODUCTION

This is a purported securities class action on behalf of two
groups of purchasers of American Superconductor Corporation
common stock.  One group purchased common stock during the period
from July 29, 2010, through July 11, 2011, and alleges violations
of Sections 10(b) and 20(a) of the Securities Exchange Act of
1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder
against American Superconductor Corporation (the "Issuer") and

certain of its officers and directors (the "Individual Defendants").   The other group purchased common stock in the Issuer's public offering that commenced on November 12, 2010 (as a result of which the Issuer sold 4,600,000 shares of common stock and raised $163,000,000.00), and alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against the Issuer, the Individual Defendants, and the underwriters of the offering, Morgan Stanley & Co. LLC, Deutsche Bank Securities, and Jefferies and Co. (the "Underwriters").

The Issuer, the Individual Defendants, and the Underwriters moved to dismiss the action in its entirety.   In its Order of December 16, 2011, this Court denied the Issuer and the Individual Defendants' motion to dismiss as to the Securities Act claims and took under advisement the Exchange Act claims.   The Court also took the Underwriters' motion to dismiss under advisement.

**A.   Procedural Posture**

On June 6, 2011, the plaintiffs in various related actions filed motions to consolidate the cases of <u>Lenartz</u> v. <u>American Superconductor Corporation et al.</u>, No. 11-10582, <u>Chun</u> v. <u>American Superconductor Corporation et al.</u>, No. 11-10610, <u>Godt</u> v. <u>American Superconductor Corporation et al.</u>, No. 11-10653, <u>Murphy</u> v. <u>American Superconductor Corporation et al.</u>, No. 11-10665, <u>Griffin</u>

v. <u>American Superconductor Corporation et al.</u>, No. 11-10707, <u>Foster</u> v. <u>American Superconductor Corporation et al.</u>, No. 11-10743, <u>Marlborough Family Revocable Trust UAD</u> v. <u>Yurek et al.</u>, No. 11-10825, and <u>Norfolk County Retirement System</u> v. <u>American Superconductor Corporation et al.</u>, No. 11-10849, and sought appointment as lead plaintiff. <u>See</u> Mot. Steamfitters Local 449 Pension Fund Consol., Appointment Lead Pl., Approval Its Selection Lead Counsel, ECF No. 4; Employees Ret. Sys. City St. Louis's Mot. (1) Appointment Lead Pl., (2) Approval Its Selection of Lead Counsel, (3) Consol. All Related Actions, ECF No. 8; Steamship Trade Association/Int'l Longshoremen's Pension Benefit Fund Consol., Appointment Lead Pl., Approval Selection Counsel, ECF No. 10; Mot. Profits Only LLC Jian Xiao Consol., Appointment Lead Pls., Approval Lead Pls.' Selection Co-Lead Liason Counsel, ECF No. 13; Notice Mot. Consol., Appointment Lead Pl. Approval Selection Counsel, ECF No. 18; Notice Mot. Dong Won Kang Consol. Related Cases, Appointment Lead Pl. Approval Lead Counsel, ECF No. 21; Mot. Atagun Serifsoy Consol. All Related Cases, Appointment Lead Pl. Approval Selection Lead Counsel, ECF No. 24.

On June 7, 2011, this Court granted the plaintiffs' motions to consolidate, via electronic order, and ordered that all further pleadings should be filed under the lead case, <u>Lenartz</u>. The Court later appointed Plumbers and Pipefitters National Pension Fund ("Lead Plaintiff Pension Fund") as lead plaintiff.

Order Granting Mot. Appointment Lead Pl. Approval Selection Counsel, ECF No. 42.  On August 31, 2011, Lead Plaintiff Pension Fund filed the Amended Complaint.  Consolidated Am. Compl. Violations Fed. Sec. Laws, ECF No. 56.

On October 14, 2011, the Issuer and the named officers and directors of the Issuer, Vikram S. Budhraja, Peter O. Crisp, Richard Drouin, David R. Oliver, Jr., John B. Vander Sande, John W. Wood, Jr., Daniel McGahn, Gregory J. Yurek and David A. Henry (the "Individual Defendants"), filed a motion to dismiss the Amended Complaint, Def. American Superconductor Corp. Individual Defs.' Mot. Dismiss Consolidated Am. Compl. ("Issuer & Individual Defs.' Mot."), ECF No. 68; Mem. Law Supp. Def. American Superconductor Corp. & Individual Defs. Supp. Mot. Dismiss Consolidated Am. Compl. ("Issuer & Individual Defs.' Mem."), ECF No. 71, which motion is presently before the Court.

On November 7, 2011, Lead Plaintiff Pension Fund filed an opposition to the motion, Mem. Law Opp'n Mot. Dismiss Consol. Am. Compl. Filed Defs. American Superconductor Corp. Individual Defs. ("Lead Pl.'s Opp'n Issuer & Individual Defs.'s Mot."), ECF No. 73, and the Issuer and Individual Defendants filed a reply brief on November 18, 2011, Reply Further Supp. Def. American Superconductor Corp. & Individual Defs.' Mot. Dismiss Consol. Am. Compl. ("Issuer & Individual Defs.' Reply"), ECF No. 77.

On October 14, 2011, the Underwriters filed a motion to

dismiss the Amended Complaint, Defs. Morgan Stanley & Co. LLC, Deutsche Bank Sec. Inc. and Jefferies & Company Inc.'s Mot. Dismiss Pl.'s Consol. Am. Compl. ("Underwriter Defs.' Mot. Dismiss"), ECF No. 65; Mem. Law Defs. Morgan Stanley & Co., LLC, Deutsche Bank Sec. Inc.  Jefferies & Company, Inc.'s Supp. Mot. Dismiss Pl.'s Consol. Am. Compl. ("Underwriter Defs.' Mem."), ECF No. 66, which motion is presently before the Court.  On November 7, 2011, Lead Plaintiff Pension Fund filed an opposition to the motion, Mem. Law Opp'n Mot. Dismiss Consol. Am. Compl. Filed Defs. Morgan Stanley & Co. LLC, Deutsche Bank Sec. Inc. and Jefferies & Company, Inc. ("Lead Pl.'s Opp'n Underwriter Defs.'s Mot."), ECF No. 75, and the Underwriters filed a reply brief on November 18, 2011, Reply Mem. Law Defs. Morgan Stanley & Co. LLC, Deutsche Bank Sec. Inc. and Jefferies & Company, Inc. Further Supp. Their Mot. Dismiss Pl.'s Consol. Am. Compl. ("Underwriter Defs.' Reply"), ECF No. 76.

The Court heard oral argument on the motions on December 13, 2011.  On December 16, 2011, the Court issued an order (1) denying the Issuer and Individual Defendants' motion to dismiss as to the Securities Act claims, Counts Three, Four, and Five; (2) taking under advisement the Exchange Act claims, Counts One and Two; and (3) taking under advisement the Underwriters' motion to dismiss.  Order 1, ECF No. 80.

The Court's Order further instructed the Lead Plaintiff

Pension Fund to file a motion for leave to file an amended complaint that explicitly excluded the Underwriters from each allegation in Paragraphs 1 through 63 implicating the Underwriters in any fraudulent activity.  Id. at 2.  The Lead Plaintiff Pension Fund complied with the Court's order and filed its motion to amend on January 17, 2012, Lead Pl.'s Mot. Leave File Proposed Second Am. Compl., ECF No. 83, which motion was granted on February 13, 2012, Elec. Order, Feb. 13, 2012.  The Lead Plaintiff Pension Fund's Second Consolidated Amended Complaint (the "Complaint") is thus the operative pleading in this case.  See Second Consol. Am. Compl. Violations Fed. Sec. Laws ("Compl."), ECF No. 86.

**B.   Facts as Alleged**

As the Court's disposition of the case requires an intensely fact-based inquiry, a thorough recitation of the facts is necessary.

**1.   The Issuer**

The Issuer is a power technologies company that offers an array of proprietary technologies and solutions spanning the electric power infrastructure, from generation to delivery to end use.  Compl. ¶ 2.  The Issuer maintains offices and operations in eleven countries, including the United States and China, and derives the majority of its revenue from the sale of wind turbine electrical control systems to customers in North America, Europe,

and the Asia-Pacific region.  Id. ¶¶ 40, 43.  The Issuer is a
publicly-traded company listed on the NASDAQ, with its
headquarters in Devens, Massachusetts.  Id. ¶ 22.

The Issuer's business model works as follows:  The Issuer
licenses proprietary wind turbine designs and provides various
consulting and support services to wind turbine manufacturers, in
order to enable the Issuer's customers to quickly get into wind
turbine production.  Id. ¶ 42.  The Issuer then manufactures and
sells to those customers electrical control systems and
components for the wind turbines, which utilize the Issuer's
proprietary power electronic converters and enabling software.
Id.  The Issuer typically enters into contracts with its wind
turbine manufacturer customers that provide the Issuer with a
"right of first refusal" to supply the customer with wind turbine
components.  Id.

## 2.   The Individual Defendants

Gregory J. Yurek ("Yurek") served as Chief Executive Officer
("CEO") and Chairman of the Board of Directors of the Issuer
until his retirement on June 1, 2011.  Id. ¶ 23.  David A. Henry
("Henry") served as Senior Vice President and Chief Financial
Officer ("CFO") of the Issuer.  Id. ¶ 24.  Daniel McGahn
("McGahn") served as Senior Vice President and Chief Operating
Officer ("COO") of the Issuer until June 1, 2011, when he assumed
the position of CEO upon Yurek's retirement.  Id. ¶ 25.  Vikram

S. Budhraja ("Budhraja") served as a director of the Issuer and was a signatory to the Issuer's registration statement used to effectuate the public offering (the "Registration Statement"). <u>Id.</u> ¶ 26. Peter O. Crisp ("Crisp") served as a director of the Issuer and was a signatory to the Registration Statement. <u>Id.</u> ¶ 27. Richard Drouin ("Drouin") served as a director of the Issuer and was a signatory to the Registration Statement. <u>Id.</u> ¶ 28. David R. Oliver, Jr. ("Oliver") served as a director of the Issuer and was a signatory to the Registration Statement. <u>Id.</u> ¶ 29. John B. Vander Sande ("Vander Sande") served as a director of the Issuer and was a signatory to the Registration Statement. <u>Id.</u> ¶ 30. John W. Wood, Jr. ("Wood") served as a director of the Issuer and was a signatory to the Registration Statement. <u>Id.</u> ¶ 31.

### 3. Issuer's Relationship with Sinovel Wind Group Co., Ltd.

During the period from July 29, 2010, through July 11, 2011 (the "Class Period"), <u>id.</u> ¶ 1, the Issuer's revenues were primarily derived from a single customer, Sinovel Wind Group Co., Ltd. ("Sinovel"), a manufacturer of wind turbines based in China. <u>Id.</u> ¶ 3. Sinovel is the largest wind turbine maker in China, and the third largest in the world. <u>Id.</u> ¶ 44. Sales to Sinovel represented 72% of the Issuer's reported revenues for the first fiscal quarter of 2010, 79% of the Issuer's reported revenues for the second fiscal quarter of 2010, and 73% of the Issuer's

reported revenues for the third fiscal quarter of 2010.  Id.

The Issuer entered into the relevant contract with Sinovel (the "Contract") in June 2008 for purchase of electrical control system components, stipulating a twenty-eight month period and a contract price of $470,000,000.00.[1]  Id. ¶ 46.  The Contract required Sinovel to provide a letter of credit prior to each shipment, stating in relevant part that "Two (2) weeks before each shipment date, an irrevocable letter of credit in the amount of 95% of each shipment value shall be issued by a first class Chinese bank.  If the L/C [letter of credit] is delayed, the delivery time will be postponed accordingly."  Id. ¶ 47 (citing the Issuer's Form 8-K filed June 11, 2008).  Lead Plaintiff Pension Fund alleges, based upon information and belief,[2] that Sinovel failed to provide the required letters of credit both prior to and during the Class Period, and that the Issuer shipped the electrical control system components on multiple occasions without a letter of credit.  Id. ¶ 48.

---

[1] The original contract stipulated a thirty-six month period at a price of $450,000,000.00, but subsequently was amended by agreement of the parties.  Compl. ¶ 46.

[2] Lead Plaintiff Pension Fund bases this allegation on the Issuer's admission, in connection with its restatement of its financial results for the second and third fiscal quarters of 2010, that there may be deficiencies in "its controls to evaluate and monitor customer creditworthiness," as well as in "its controls over the identification and evaluation of revenue transactions which deviated from contractually established payment terms."  Id. ¶ 50 (emphasis omitted).

### 4. Accounting Policies

The Issuer's publicly disclosed revenue recognition policy, contained in its Annual Report on Form 10-K for its fiscal year ending March 31, 2010 (the "2009 Form 10-K"), stated that the Issuer recognized revenue "upon customer acceptance," provided that "collectability [of payment] is reasonably assured." Id. ¶ 49 (citing the Issuer's 2009 Form 10-K) (alteration in original). The Issuer also represented in its filings with the Securities and Exchange Commission ("SEC") that its financial statements conformed to Generally Accepted Accounting Principles ("GAAP") and that the Issuer maintained a sound system of internal controls over its financial reporting. Id. ¶ 52.

The Lead Plaintiff Pension Fund claims, in a conclusory manner, that collectability on the Contract was not "reasonably assured" because of Sinovel's alleged failure to provide letters of credit. Id. ¶ 49. This failure allegedly caused the Issuer and Individual Defendants to "kn[ow] that Sinovel's credit-worthiness was questionable," id., yet they continued to allow these shipments "for no reason other than to cause [the Issuer] to prematurely record tens of millions of dollars in sales to Sinovel," id. ¶ 59.

### 5. The Secondary Offering

On November 8, 2010, the Issuer filed a Form S-3 Shelf Registration Statement and accompanying Prospectus with the SEC,

offering periodically to sell common stock of the Issuer.  Id. ¶¶ 164-165.  On November 9, 2010, the Issuer filed the Prospectus Supplement, which offered 4,600,000 common shares to the public. Id. ¶ 166.  The Issuer amended the Prospectus Supplement on November 12, 2010, for the purpose of, inter alia, setting the price of the offering at $35.50 per share.  Id.  The investment banks of Morgan Stanley & Co., LLC ("Morgan Stanley"), Deutsche Bank Securities ("Deutsche Bank"), and Jefferies & Co. ("Jefferies") served as underwriters for the offering.  Id. ¶ 33.

The Issuer commenced the public offering on November 12, 2010 (the "Secondary Offering"), pursuant to which the Issuer sold 4,600,000 shares of common stock, at a price of $35.50 per share, raising $163,000,000.00.  Id. ¶¶ 166-167.  The Prospectus and Prospectus Supplement stated that the Issuer planned to use the net proceeds to expand its superconductor manufacturing capacity, to pursue strategic business relationships, including minority investments and acquisitions, and for other general corporate purposes.  Id.  The Lead Plaintiff Pension Fund alleges that such acquisitions "would enable [the Issuer] to lessen its dependence on Sinovel - before investors discovered that [the Issuer's] primary customer was not credit-worthy."  Id. ¶ 6.  The Lead Plaintiff Pension Fund also alleges that the Secondary Offering served as a motivation for the Issuer and the Individual Defendants improperly to recognize revenue from the Contract, in

order to inflate the stock value artificially and "enabl[e] [the Secondary Offering] to be conducted at the best available terms." Id. ¶ 63.

Moreover, the Lead Plaintiff Pension Fund alleges that the Registration Statement, which incorporated the Prospectus and the Prospectus Supplement, was prepared negligently as it (1) failed to disclose "material changes," namely that the Issuer was shipping products without receiving a letter of credit and improperly recognizing revenue, thus violating GAAP and the Issuer's own accounting policies, incorporated by reference into the Registration Statement; (2) included misleading risk disclosures that did not mention Sinovel's failure to provide letters of credit and the Issuer's improper revenue recognition; and (3) submitted inaccurate financial statements in the Issuer's Second Quarter Form 10-Q.  Id.  ¶¶ 169-183.

### 6.  The Acquisition

On March 14, 2011, the Issuer issued a press release announcing that it had signed a definitive agreement to acquire The Switch Engineering Oy, a power technologies company headquartered in Finland, for €190,000,000.00 (approximately $265,000,000.00), with approximately $186,000,000.00 paid in cash and the remainder paid in stock.  Id. ¶ 112; id. at 45 n.7.  The press release stated that the acquisition would "[s]ignificantly [e]xpand" the Issuer's wind business and "diversify [the

Issuer's] customer base and channels to market." <u>Id.</u> ¶ 112.

### 7.    The Restatement of Financials

On March 14, 2011, two weeks before the end of the Issuer's fiscal year, the Issuer warned of an expected slowdown in the Issuer's business with Sinovel, attributing it to the transition to a new contract with Sinovel. <u>Id.</u> ¶ 9.  The Lead Plaintiff Pension Fund alleges that such attribution is false, because the new contract contained payment terms identical to those in the Contract, and claims that the Issuer was merely "concealing the truth about the [Issuer's] business with Sinovel" long enough to consummate the acquisition announced the same day.  <u>Id.</u>

On April 5, 2011, the day before the newly-public Sinovel filed its annual report with Chinese regulators, the Issuer issued a press release stating that Sinovel had refused delivery of certain contracted shipments and failed to pay for certain contracted shipments made in fiscal 2010.  <u>Id.</u> ¶ 10.  The Issuer adjusted its full year revenue guidance from $430,000,000.00 to less than $355,000,000.00, and announced that it was "reviewing the appropriateness of the timing of its revenue recognition on approximately $56 million of unpaid shipments in the second, third, and fourth quarters of fiscal 2010." <u>Id.</u>

On May 31, 2011, the Issuer announced it would delay filing its 2010 annual report while it completed a review and audit "of certain revenues associated with Shipments to customers in China

during the second, third and fourth fiscal quarters" and "expect[ed] to reverse the recognition of a material amount of revenue." Id. ¶ 11 (alteration in original).  On July 11, 2011, the Issuer issued a press release announcing that its financial statements for the second quarter, ending September 30, 2010, and the third quarter, ending December 31, 2010, "should no longer be relied upon." Id. ¶ 12 (citation omitted).  The Issuer acknowledged that it had improperly recognized revenue for unpaid shipments to Sinovel after September 30, 2010, and for unpaid shipments to "certain [other] Chinese customers" after August 31, 2010, "based upon customer receipt of shipments but prior to . . . receipt of payment," and stated that it should not have recognized revenue "until [the Issuer] is paid, or payment is otherwise reasonably assured." Id.  As a result, the Issuer stated it expected to restate its second quarter revenues by approximately $3,500,000.00 and its third quarter revenues by an estimated $71,200,000.00, and expected to report full year 2010 revenues of $307,000,000.00[3] (in contrast to the original projection of $430,000,000.00). Id. ¶¶ 10-12.

In its 8-K SEC filing on the same day, July 11, 2011, the

---

[3] As of the date of the Complaint, the Lead Plaintiff Pension Fund alleges that the Issuer's restatement and audit of its financial results was ongoing, and the Issuer had not yet filed financial statements for the fourth quarter and full year 2010, or the first quarter of 2011, ended June 30, 2011.  Compl. ¶ 16.

Issuer stated it "may have one or more material weaknesses in its internal control over financial reporting to ensure the accuracy of revenue recognition in China," specifically in regard to "deficiencies in its controls to evaluate and monitor customer creditworthiness" and deficiencies in "its controls over the identification and evaluation of revenue transactions which deviated from contractually established payment terms." Id. ¶ 13.

### 8.    The Alleged Material Misstatements or Omissions

The Lead Plaintiff Pension Fund has provided myriad statements by Individual Defendants Yurek, Henry or McGahn that are allegedly materially false and misleading. See id. ¶¶ 65-129. A few representative statements are sufficiently illustrative.[4]

On July 29, 2010, Henry stated, in the Issuer's press release, that the Issuer was "increasing [its] revenue forecast for full year fiscal 2010 from a range of $415 million to $420 million to a range of $420 million to $430 million." Id. ¶ 65. When an analyst in a conference call inquired as to the Issuer's favorable financial results, Henry responded that "[h]igher wind turbine component shipments were the main factor in our sequential and year-over-year growth. . . . Sales [to Sinovel]

---

[4] The Lead Plaintiff Pension Fund also cites SEC filings submitted during the Class Period as misleading. See id. ¶¶ 87, 104, 127.

represented 72% of total revenues in the first fiscal quarter."
Id. ¶ 67 (citation omitted).  When asked about the Issuer's
backlog, Yurek stated, "we wouldn't have updated our revenue
guidance today if we didn't feel, you know, pretty confident
about getting those orders, booking them and being able to ship
them."  Id. ¶ 71 (citation omitted).

On August 10, 2010, Henry spoke at a conference, stating
that "the relationship with Sinovel is broadening.  It is getting
stronger and we expect our revenues with Sinovel to grow going
forward."  Id. ¶ 77 (citation omitted).  During a November 2,
2010, conference call with analysts and investors, Yurek stated:
"So, we're shipping core electrical components and control
systems [to Sinovel] . . . on predetermined schedules . . . so
there's been no shift from our contracts that are in place
here. . . . [W]e're shipping on schedule for both of those."  Id.
¶ 83.

On December 11, 2010, Barron's published a story based on
documents Sinovel filed in anticipation of its initial public
offering, stating:

> [T]he optimism in Yurek's outlook, and in [the Issuer's]
> high valuation, may be giving insufficient weight to
> signs that China's boom in wind power is slowing. . . .
>     Sinovel's production has steadily outstripped its
> sales.  Sooner or later, Sinovel will have to rationalize
> its levels of production and inventory - and in turn, its
> voracious purchases from [American Superconductor Corp.].
> That risk isn't priced into [their] shares.
> . . . .
>     But as fast as Sinovel has grown, the prospectus

> shows that its production has outpaced shipments by about
> a third.  Consequently . . . average inventories piled up
> in the six months ended June to more than 270 days' cost
> of materials.   The Chinese prospectus reports . . .
> roughly track the sales to Sinovel reported by AMSC.  The
> only exception is the first half of calendar year 2010,
> when Sinovel shows some $70 million worth of purchases.
> AMSC reported selling about twice that amount.   The
> prospectus also shows that Sinovel has been buying
> electronic-control  systems  from  another  company.
>
> "We don't see any issues there," says AMSC Yurek.
> His electronics will be in the bigger turbines that
> Sinovel is planning for China's offshore wind farms.

Id. ¶ 93.  At a subsequent conference on January 11, 2011, Yurek

said, "Sinovel keeps giving us big orders.  And I'm not going to

turn down any of these big orders.  Now, more of those . . . are

going to be coming this year, I believe.  So we'll keep taking

those orders."  Id. ¶ 96.

On February 1, 2011, Henry commented in a press conference

that "For most of this fiscal year, Sinovel has been paying us

between 60 and 90 days after shipment. . . . [P]ayments have not

been delayed despite the reported increase in accounts

receivable.  So far this quarter we received $30 million from

Sinovel and more is expected soon."  Id. ¶ 102.

On March 14, 2011, after issuing a press release announcing

a downward revision in the Issuer's full year guidance, Yurek

stated:

> There are two primary reasons why we expect our
> organic growth rate to slow.  The first reason is that we
> now see the rate of growth of wind turbine sales in China
> remaining flat or decreasing in 2011. . . .
> . . . .

> The second reason we expect our growth rate to slow
> is the transition in our contracts with Sinovel for the
> sale of core electrical components . . . .
> . . . .
> So just based on the terms of [the new contract]
> shipments in the June 2011 quarter are expected to be
> well below our shipments in the March 2011 quarter.
> . . . .
> Net-net we currently expect that our revenues from
> Sinovel will be roughly flat year over year in fiscal
> 2011.

Id. ¶ 113 (citation omitted).

### 9.   Market Reaction to the Restatement

There was significant market and analyst reaction after the
Issuer's announcement on April 5, 2011 that Sinovel had rejected
certain shipments so that it could reduce its level of inventory,
and that the Issuer would be restating the revenue for the
second, third and fourth quarters of fiscal 2010.  Id. ¶ 116.  An
analyst report noted that Sinovel's annual report showed that
Sinovel "was able to sell every turbine it made" during the
second half of 2010, and "did not report any payables older than
a year with [American Superconductor Corp.]."  Id. ¶ 118.  The
analyst thus concluded that the Issuer's "explanation for the
rejection of shipment . . . [was] unreasonable."  Id.  One
analyst report downgraded the Issuer's stock from "Buy" to
"Hold," while another report downgraded the stock from "Buy" to
"Underperform."  Id. ¶ 119.

Barron's published a follow-up article on the Issuer and
Sinovel, stating, "the amounts that the prospectus showed for

Sinovel's 2010 purchases from [the Issuer] didn't jibe with the U.S. outfit's reports. . . . Our concerns were dreadfully warranted.  Late Tuesday, [the Issuer] issued a bizarre announcement saying that Sinovel had refused the U.S. company's end-of-quarter deliveries."  <u>Id.</u> ¶ 120.

On July 11, an analyst report advised, "We consider the [Issuer's] stock to be uninvestable given the lack of reliable financial statements and no resolution from Sinovel."  <u>Id.</u> ¶ 129. Another analyst report stated, "we question whether [the Issuer] knew the collectability of its shipments was achievable [and] cannot help thinking there was some channel stuffing."  <u>Id.</u>

The Issuer's stock bottomed out on July 12, 2011, closing at $8.12 per share, a drop of over 78% from the Class Period high of $38.09 per share, reached on October 13, 2010.  <u>Id.</u> ¶ 14.

### 10.   Trading by the Individual Defendants

During the Class Period, Yurek, Henry, McGahn and another high-level Issuer insider, Angelo Santamaria ("Santamaria"), collectively sold 427,522 shares of their personally-held American Superconductor common stock for proceeds of over $14,900,000.00.  <u>Id.</u> ¶ 137.  These sales were made pursuant to a stock trading plan that was adopted in accordance with Rule 10b5-1 of the Exchange Act.  <u>Id.</u> ¶ 138.  The Lead Plaintiff Pension Fund alleges, however, that Yurek, Henry, McGahn and Santamaria adopted or amended the 10b5-1 plan to take advantage of inflation

in the price of Issuer stock, as they were in possession of material, non-public information (that the Issuer was making shipments to Sinovel without letters of credit and improperly recognizing the revenue).  Id.

Henry sold 8,000 shares on October 6, 2010, and 11,600 shares on May 13, 2011 (after the April 5 disclosure), netting $421,684.00 on 25.03% of his stock.  Id.  McGahn sold 900 shares on May 12, 2011, and 11,500 shares on May 17, 2011 (both sales after the April 5 disclosure), netting $138,744.00 on 9.32% of his stock.  Id.  Santamaria sold 2,000 shares on May 16, 2011, and 10,000 shares on May 17, 2011 (both sales after the April 5 disclosure), netting $134,100.00 on 22.28% of his stock.  Id. Yurek sold 57,075 shares on October 6, 2010, 73,856 shares on October 8, 2010, 71,372 shares on October 11, 2010, 165,228 shares on October 12, 2010, and 15,992 on October 13, 2010, netting $14,209,677.00 on 68.42% of his stock.  Id.

## II.  ANALYSIS

### A.  Standard of Review for a Motion to Dismiss

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007).  A mere recital of the legal elements supported only by conclusory statements is not sufficient to state a cause of action.  Id. at 555.

**B.   Heightened Pleading Standards in the Securities Context Under Rule 9(b) and the Private Securities Litigation Reform Act**

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  The First Circuit is "especially strict in demanding adherence to Rule 9(b) in the securities context." Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996).[5]  Thus, "the complaint must set forth specific facts that make it reasonable to believe that the defendant[s] knew that a statement was materially false or misleading.  The rule requires that the particular times, dates, places, or other details of the alleged fraudulent involvement of the actors be alleged." Gross, 93 F.3d at 991 (citing Lucia v. Prospect St. High Income Portfolio, 36 F.3d 170, 174 (1st Cir. 1994)).

The Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, codified at 15 U.S.C. § 78u-4, imposes scienter pleading standards even more rigorous than the requirements of

---

[5] Gross has been partially superceded on other grounds by the Private Securities Litigation Reform Act of 1995, which is codified at 15 U.S.C. § 78u-4.  Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999).

Rule 9(b).[6]  Under the PSLRA, a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

### C.   Exchange Act Claims

#### 1.   Section 10(b) and Rule 10b-5 Claim

To state a claim under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder (a "10b-5 claim"), "a plaintiff must allege that: (1) in connection with the purchase or sale of securities, (2) the defendant made a false statement or omitted a material fact, (3) with the requisite scienter, and that (4) plaintiff relied on the statement or omission, (5) with resultant injury." In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 52 (D. Mass. 1998) (citing Gross, 93 F.3d at 992;

---

[6] The heightened pleading requirement in the fraud context has three primary purposes: "to place the defendants on notice; to safeguard defendants from unwarranted damage to their reputations; and to safeguard defendants from the danger of strike suits." In re Lotus Dev. Corp. Sec. Litig., 875 F. Supp. 48, 51 (D. Mass. 1995) (Saris, J.) (citing New England Data Servs. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987)). "A 'strike suit' refers to a largely groundless claim brought by a plaintiff who thereafter engages in extensive discovery to increase settlement value rather than to discover relevant evidence of fraud." Fitzer v. Security Dynamics Tech., Inc., 119 F. Supp. 2d 12, 17-18 (D. Mass. 2000) (citing In re Lotus, 875 F. Supp. at 51).

Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216-17 (1st Cir.
1996)).  A misrepresentation or omission is material, and
therefore actionable, only if a reasonable investor would have
viewed it as "having significantly altered the total mix of
information made available."  Basic, Inc. v. Levinson, 485 U.S.
224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc.,
426 U.S. 438, 449 (1976)).

The Lead Plaintiff Pension Fund claims that the Issuer,
Yurek, Henry, and McGahn are liable under 10b-5, in that: (1) in
connection with the purchase or sale of the Issuer's publicly
traded securities on the NASDAQ, see Compl. ¶¶ 21-22; (2) the
Issuer, Yurek, Henry, and McGahn made numerous false and
misleading statements and failed to disclose that the Issuer was
shipping product to Sinovel and certain other Chinese customers
on multiple occasions without having received a letter of credit,
therefore recognizing revenue in violation of GAAP and its own
accounting policies, id. ¶ 143; (3) the Issuer, Yurek, Henry, and
McGahn knew or recklessly disregarded the falsity of their
statements and intended artificially to inflate the value of the
Issuer's stock, id. ¶ 130; (4) the fraud-on-the-market theory[7]

---

[7] The fraud-on-the-market theory of reliance, adopted by the
Supreme Court in the plurality opinion in Basic, 485 U.S. at 247,
creates a rebuttable presumption in the context of publicly-
traded companies that investors who bought or sold a security at
market price did so "in reliance on the integrity of that price."
"Because most publicly available information is reflected in
market price, an investor's reliance on any public material

applies to establish reliance by the Lead Plaintiff Pension Fund

on the defendants' statements, id. ¶¶ 151-152; and (5) the Lead

Plaintiff Pension Fund suffered economic loss in that the stock

value declined drastically as a result of the Issuer's

disclosures regarding the revenue restatement, id. ¶ 144.

### a.  Scienter

In order to establish scienter, the plaintiff must plead "a

mental state embracing [an] intent to deceive, manipulate, or

defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12

(1976).  Scienter can be proved by showing either knowledge that

the statements at issue were materially false or misleading, or

recklessness in that regard, and the complaint must so plead.

See Geffon v. Micrion Corp., 249 F.3d 29, 35 (1st Cir. 2001);

Greebel, 194 F.3d at 198-201.

Simple negligence does not meet the recklessness standard,

---

misrepresentations, therefore, may be presumed for purposes of a
Rule 10b-5 action."  Id.
     The First Circuit in In re PolyMedica Corp. Securities
Litigation, 432 F.3d 1, 14-15 (1st Cir. 2005), held that, for a
fraud-on-the-market case to succeed, the market must reflect all
measures of informational efficiency, as financial economists use
that term.  This Court, in In re PolyMedica Corp. Securities
Litigation, 453 F. Supp. 2d 260, 278 (D. Mass. 2006), applied
Polymedica (and perhaps expanded its complexity) to dismiss a
putative security fraud-on-the-market class action.
     Recent scholarship suggests that these cases miss the point,
arguing that Basic "is far more a lesson in civil procedure than
in financial economics."  Donald C. Langevoort, Basic at Twenty:
Rethinking Fraud on the Market, 2009 Wis. L. Rev. 151, 158
(2009).

nor does inexcusable negligence.    Greebel, 194 F.3d at 198-99.

Rather, courts require "a highly unreasonable omission [or

statement], involving . . . an extreme departure from the

standards of ordinary care, . . . which presents a danger of

misleading buyers or sellers that is either known to the

defendant or is so obvious the actor must have been aware of it."

Id. at 198 (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d

1033, 1045 (7th Cir. 1977)).

The allegations contained in the complaint must create a

"strong" inference of scienter.    Greebel, 194 F.3d at 196-97.

The Supreme Court instructed in Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308 (2007), that the inference of scienter

"must be more than merely plausible or reasonable - it must be

cogent and at least as compelling as any opposing inference of

nonfraudulent intent."    Id. at 314.   In making the scienter

determination, courts consider the totality of the circumstances,

rather than examining each alleged omission or misstatement in

isolation.    See In re Cabletron Sys., Inc., 311 F.3d 11, 40 (1st

Cir. 2002).

### i.    Accounting Fraud

The Lead Plaintiff Pension Fund's scienter claim is a house

of cards.    The allegations of accounting fraud and artificial

inflation of the Issuer's stock for purposes of the Secondary

Offering all rest on two assumptions.    First, Yurek, Henry, and

McGahn must have known or recklessly disregarded that Sinovel or other Chinese customers were not providing letters of credit prior to shipments as stipulated in the Contract.  Second, Yurek, Henry, and McGahn must have known or recklessly disregarded that the purchasers' failure to provide letters of credit precluded those shipments from properly being considered "reasonably assured," and therefore recognized as revenue at the relevant times.  The Lead Plaintiff Pension Fund has not sufficiently pled either of these foundational elements, thus toppling the other allegations derived therefrom.

As a starting point, the Lead Plaintiff Pension Fund's allegation that Sinovel and other Chinese companies were in fact not providing letters of credit is based solely on "information and belief."  When making allegations on "information and belief," the PSLRA requires the complainant to "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  This requirement "holds true even when the fraud relates to matters peculiarly within the knowledge of the opposing party."  Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) (quoting Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 13-14 (1st Cir. 1984).

The Lead Plaintiff Pension Fund states that its allegation that Sinovel and other Chinese companies were not providing letters of credit is based on the Issuer's admission - in

connection with the revenue restatement of the second and third
fiscal quarters of 2010 – that there may be deficiencies in "its
controls over the identification and evaluation of revenue
transactions <u>which deviated from contractually established
payment terms</u>." Compl. ¶ 50. The Complaint does not allege why
the letter of credit requirement is the only relevant payment
provision to which the Issuer could have been referring. Nor
does the Complaint point to any admissions by the Issuer or
Individual Defendants, or statements by employees or analysts,
which would support its conclusion that Sinovel or other Chinese
companies failed to provide letters of credit for multiple
shipments from the Issuer.

Even if it reasonably could be concluded that the Issuer
was not receiving letters of credit (since if letters of credit
had been provided, the Issuer presumably would have been paid 95%
of the contract price by the bank,[8] even upon the customers'
refusal to pay), the Complaint does not contain any
particularized facts suggesting that Yurek, Henry, or McGahn knew

---

[8] A letter of credit is

> [a]n instrument under which the issuer (usually a bank),
> at a customer's request, agrees to honor a draft or other
> demand for payment made by a third party (the
> beneficiary), as long as the draft or demand complies
> with specified conditions, and regardless of whether any
> underlying agreement between the customer and the
> beneficiary is satisfied.

Black's Law Dictionary 923 (8th ed. 2004).

that letters of credit were not being provided.  Rather, the
Complaint merely makes generalized claims that "[t]he fraudulent
scheme herein could not have been perpetrated during the Class
Period without the knowledge and complicity or, at least, the
reckless disregard of the personnel at the highest levels of the
Company, including Defendants Yurek, Henry and McGahn," id. ¶
131, and that "their positions . . . [afforded them] access to
material non-public information," id. ¶ 132.

This Court in In re Peritus Software Services, Inc.
Securities Litigation, 52 F. Supp. 2d 211 (D. Mass. 1999), made
clear that such "[g]eneral allusions to unspecified internal
corporate information are insufficient to withstand a motion to
dismiss."  Id. at 228 (citation omitted).  This Court has also
held, in accordance with First Circuit precedent, that "general
inferences that the defendants, by virtue of their position
within the company, 'must have known' about the company's
problems . . . [are] inadequate to withstand the special pleading
requirements in securities fraud cases."  Lirette v. Shiva Corp.,
27 F. Supp. 2d 268, 283 (D. Mass. 1998) (citing Maldonado v.
Dominguez, 137 F.3d 1, 9 (1st Cir. 1998)).

In its opposition brief, the Lead Plaintiff Pension Fund
argues that "[s]ince [the Issuer] was dependant upon Sinovel for
72-79% of its revenues, it is 'simply inconceivable' that
Defendants were unaware that [the Issuer] was shipping product to

28

Sinovel without receiving letters of credit."  Lead Pl.'s Opp'n
Issuer & Individual Defs.' Mot. 16.  The Lead Plaintiff Pension
Fund cites to this Court's decision in In re Allaire Corp.
Securities Litigation, 224 F. Supp. 2d 319, 329 (D. Mass. 2002),
where the Court stated it was "simply inconceivable that
management could not have known that [the company's newly
released product] did not work satisfactorily."  Allaire,
however, was based on much stronger evidence than the present
case.  The product was considered to be "the future of the
company," and the plaintiffs alleged that the product itself did
not work.  Id. at 323.  The management's knowledge was supported
by particularized facts such as emails from customers, customer
service records and internal communications regarding "fixes."
Id. at 329.

    In the present case, the key allegation is that a
contractual provision relating to payment was not honored.  Given
that Sinovel was the Issuer's major client, it may well have been
reckless for Yurek, Henry, and McGahn to miss the fact that
Sinovel was not providing letters of credit (if in fact, it was
not).  It bears noting, however, that the present case is
significantly less clear than the cases to which the Lead
Plaintiff Pension Fund cites.[9]

---

[9] The Lead Plaintiff Pension Fund also cites to Crowell v.
Ionics, Inc., 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (citing
Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash.

Yet even were this Court to determine that the allegations are sufficiently particularized as to Sinovel and other Chinese companies' failure to provide letters of credit, and management's knowledge thereof, the second foundational element - that the absence of a letter of credit necessarily means that collectability of the payment is not "reasonably assured" - is inadequately pled.

The Lead Plaintiff Pension Fund asserts that "Defendants knew that Sinovel's credit-worthiness was questionable because Sinovel was not providing the requisite letters of credit, and, therefore, [the Issuer] was recognizing revenues on shipments when collectability was not 'reasonably assured.'" Compl. ¶ 49. The Lead Plaintiff Pension Fund alleges that in so doing, the Issuer was in violation of GAAP and its own accounting policies as set forth in its SEC filings. Id. ¶¶ 49, 57.

---

1998), abrogated on other grounds by In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970 (9th Cir. 1999)), which states that "[f]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers." Crowell involved allegations of a fraudulent sales practice and included particularized facts such as an email received by an employee which indicated that the fraudulent sales practice was ordered by a company vice president and imposed company-wide. Id. at 19. In Epstein, 993 F. Supp. at 1326, the plaintiffs alleged that the company's core product was "technologically incapable of meeting requirements that are central to [the company's] continued survival as a business entity." While the Issuer's contract with Sinovel was an "important transaction," it is less clear that Sinovel's failure to provide a letter of credit constitutes a critical fact analogous to the cases cited.

Under GAAP, revenue is recognized when (1) it is realized or realizable and (2) it is earned.  Fin. Accounting Standards Bd., Accounting Standards Codification ("ASC") 605-10-25.  Revenue is generally realized or realizable when "persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price to the buyer is fixed or determinable, and collectability is reasonably assured."  See ASC 605-10-S99 (footnotes omitted) (quoting the text of Sec. and Exch. Comm'n, Codification of Staff Accounting Bulletins, Topic 13: Revenue Recognition).  Revenue is earned when "the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  ASC 605-10-25.  The Issuer's policy of revenue recognition, disclosed in its SEC filings, mirrors the GAAP provision.  Compl. ¶ 56.

Fatally, the Lead Plaintiff Pension Fund does not point to any provision in GAAP or the Issuer's accounting policy, nor does it cite to any commentary, suggesting that a letter of credit is a pre-requisite to payment being "reasonably assured" and therefore realizable, or even that the existence (or non-existence) of such a letter is a major consideration for accountants.

Whether collectability of a receivable is "reasonably assured" is a much more fluid concept than the Lead Plaintiff Pension Fund alleges.  The Accounting Standards Codification

31

provides that a proper determination of the collectability of a

receivable takes into account "the experience of the entity,

information about the ability of individual debtors to pay, and

appraisal of the receivables in light of the current economic

environment."  ASC 310-10-35.

In <u>In re Galileo Corp. Shareholders Litigation</u>, 127 F. Supp.

2d 251 (D. Mass. 2001) (Lindsay, J.), the court explained:

> Whether the collection of the Imagyn receivables was
> "reasonably assured," as [the plaintiff] argues, is
> fundamentally a subjective determination.  Thus,
> application of the concept of "reasonable assurance of
> collection" in a given situation is a matter of judgment
> and estimate.  In this case, "reasonable assurance of
> collection" was a fluid and subjective concept, dependent
> on the knowledge the defendants had at the time they made
> decisions about whether to record the Imagyn receivables
> in the pertinent 10-Q's . . . .  As noted earlier, the
> amended complaint does not sufficiently allege that the
> defendants had actual knowledge of information about
> Imagyn, the disregarding of which would create a strong
> inference of intentional or reckless conduct on the part
> of the defendants in the recognition of the Imagyn
> revenues.  Subject thus to judgments, as to which
> reasonable persons might disagree, the proposition that
> collectibility of the Imagyn revenues was not reasonably
> assured, standing alone as an allegation in this case,
> cannot support the strong inference of scienter required
> by the PSLRA and Rule 9(b).

<u>Id.</u> at 265-66.

That is not to say that a plaintiff could never sufficiently

plead fraud or recklessness as to a determination that

collectability was "reasonably assured."  For instance, if a

plaintiff alleged specific facts regarding the buyer's inability

to pay and its poor credit history, or management's actual

knowledge that payment was unlikely, a court might hold that sufficient to establish recklessness, and possibly intent to defraud.  The Lead Plaintiff Pension Fund has not put forth any such allegations, however, and relies exclusively on the absence of a letter of credit.

The Complaint and its supporting brief allege that the Issuer ultimately restated its revenue for the second and third quarters of fiscal 2010, thus admitting that some of the revenue should not have been recognized because it was not "reasonably assured."[10]  See, e.g., Compl. ¶¶ 58, 62; Lead Pl.'s Opp'n Issuer & Individual Defs.' Mot. 16.  As this Court has held on multiple occasions, however, the fact that a company voluntarily restated income does not in and of itself establish a strong inference of scienter.  See Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 306 (D. Mass. 2004); In re Peritus, 52 F. Supp. 2d at 224 ("[T]he mere fact that [the company] voluntarily restated income in late 1998 does not, standing alone, support a "strong

---

[10] The Lead Plaintiff Pension Fund also asserts that "[b]y virtue of their decision to restate the financial statements included in [the Issuer's] Form-10Qs . . . Defendants have now admitted that there was an 'oversight or misuse of facts' about the bona-fides of [the Issuer's] reported sales at the time that the Q2 and Q3 2010 financial statements were prepared."  Compl. ¶ 58.  Yet alleging an oversight or misuse of facts does not in itself plead the requisite mental state to establish scienter – i.e., knowledge of or recklessness with regard to the accounting errors.  These bare allegations suggest simple or perhaps inexcusable negligence, a state of mind insufficient to support a 10b-5 claim.  E.g., Greebel, 194 F.3d at 198.

inference" that [the company] knowingly or recklessly misreported income . . . ."").

In sum, the Lead Plaintiff Pension Fund has not sufficiently alleged the two foundational principles of the Complaint: first, that Sinovel and other Chinese companies failed to deliver letters of credit, and that management was aware of this fact; and second, that the absence of letters of credit necessarily meant that collectability was not "reasonably assured."

### ii. Motive of Secondary Offering and Insider Trading

The First Circuit has "specifically rejected the contention that 'facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter.'" In re Cabletron, 311 F.3d at 39 (quoting Greebel, 194 F.3d at 197). That being said, "catch-all allegations" that corporate insiders had the opportunity to act fraudulently and stood to benefit from so doing will not suffice. Greebel, 194 F.3d at 197 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999)).

It does not create a strong inference of scienter that the Issuer made a Secondary Offering during the Class Period or entered into an acquisition agreement subsequent to the Secondary Offering. See In re Galileo, 127 F. Supp. 2d at 270 ("[T]he mere statement that an acquisition occurred after [the company's] stock prices increased is insufficient even to create an inference that the two events were necessarily related, not to

34

mention insufficient to create a strong inference either of an intent to deceive or of recklessness."). As discussed above, the Lead Plaintiff Pension Fund has not adequately pled that the Individual Defendants knew or were reckless in not knowing that the Issuer was improperly recognizing revenue and as a result, artificially inflating its stock price. Merely pleading the opportunity to benefit from such wrongdoing without sufficiently pleading the wrongdoing itself does not create a strong inference of scienter.

The insider trading allegations also fail to create a strong inference of scienter. The Lead Plaintiff Pension Fund alleges that Yurek, Henry, McGahn, and Santamaria collectively earned $14,900,000.00 during the Class Period from sales of their individually-owned stock. Compl. ¶ 137. While unusual or suspicious insider trading can support a strong inference of scienter, the Lead Plaintiff Pension Fund bears the burden of showing that insider sales were in fact unusual or suspicious in timing or amount. Lirette, 27 F. Supp. 2d at 283. Such a showing requires the plaintiff to provide information on the defendant's trading both before and after the class period, so the court can assess the sales in context. Id. (citing Greebel v. FTP Software, Inc., 182 F.R.D. 370 (D. Mass. 1998) (Tauro, C.J.)).

Yurek's sale of stock earned $14,209,677.00 over the course

of the Class Period.  Id. ¶ 138.  Lead Plaintiff failed to provide the Court with information on Yurek's sales before and after the Class Period, however.  The Court cannot assess the unusualness of Yurek's sales without this context.  For this reason alone, the Lead Plaintiff Pension Fund fails to create a strong inference of scienter based on Yurek's alleged insider trading.  See Lirette, 27 F. Supp. 2d at 283 ("[The] Complaint fails to set forth the amount of trading [the officer] conducted before or after the class period, or, for that matter, any other fact that might support a finding of unusualness.  Thus, [the plaintiff's] allegations about [the officer's] trades do not support a strong inference of scienter.").

In fact, Yurek submitted two Form 4's, which were filed with the SEC in January 2010, reflecting sales of stock almost equally as large before the Class Period began.  Decl. Partick E. Gibbs Supp. Def. American Superconductor Corp. Individual Defs.' Mot. Dismiss Consolidated Am. Compl. Unopposed Request Judicial Notice Supp. Thereof, Exs. 2-3, U.S. Sec. and Exch. Comm'n, Form 4, Statement of Changes in Beneficial Ownership, ECF Nos. 69-2, 69-3.  The Lead Plaintiff Pension Fund nowhere addresses these sales.

Moreover, Yurek retired in June 1, 2011, a fact which the First Circuit and other courts have held relevant where the total sum of sales seems otherwise suspicious.  See Greebel, 194 F.3d

at 206 (listing the CFO's pending retirement at time of sale as
relevant context in determining whether the sale was suspicious);
Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1116
(N.D. Cal. 2003) ("[G]iven [the officer's] pending retirement and
the fact that he also sold a roughly proportional number of
shares in the months leading up to the class period, such sales
are not sufficiently suspicious.") (citations omitted).

   Henry and McGahn sold $421,684.00 and $138,744.00 worth of
stock respectively, Compl. ¶ 138, but at a relatively
insuspicious time.  Rather than sell before the announcement of
April 5, 2011, which revealed that Sinovel had failed to accept
contracted shipments and pay for certain shipments, McGahn sold
solely (and Henry sold in part)[11] in May 2011, after the stock
price had dropped from over $35.00 to under $12.00.  The timing
of McGahn and Henry's sales thus weighs against an inference that
the defendants were withholding material non-public information
to profit from their stock sale.  See Greebel, 194 F.3d at 207
("Selling after delivering news that causes a company's stock
price to go down is not suggestive of withholding information.").

   While the insider trading allegations may be sufficient to
create a reasonable inference that the Individual Defendants

---

   [11] Henry also sold 8,000 shares in October 2010.  Compl. ¶
138.  This only amounts to approximately 10-12% of his stock
portfolio, however, and is insufficient to create a strong
inference of scienter.

possessed the requisite state of mind, given the mitigating circumstances - i.e., that Yurek made comparable sales outside the Class Period and the Individual Defendants sold the majority of their stock after the market announcement caused the stock value to plummet - the Lead Plaintiff Pension Fund has not created a _strong_ inference of scienter.

Thus, considering the allegations as a whole, the Complaint does not create a strong inference of an intent to deceive or high degree of recklessness by the Individual Defendants that is at least as compelling as an inference of negligence, or perhaps even inexcusable negligence.  Without establishing scienter, the Lead Plaintiff Pension Fund's 10b-5 claim necessarily fails.

### 2.  Section 20(a) Claim

Section 20(a) of the Exchange Act imposes joint and several liability on any person who "directly or indirectly, controls any person liable under any provision of this chapter."  15 U.S.C. § 78t(a).  Liability under Section 20(a) is secondary, and cannot exist without first establishing the primary liability of the company or its insiders.  See Peritus, 52 F. Supp. 2d at 230.

The Lead Plaintiff Pension Fund alleges in Count Two of the Complaint that Yurek, Henry, and McGahn are liable under Section 20(a).  Compl. ¶¶ 161-163.  Because the Lead Plaintiff Pension Fund has failed to establish scienter, and thus failed to plead

primary liability under its 10b-5 claim, it has also failed to establish secondary liability under Section 20(a).

### D.  Securities Act Claims

#### 1.  Legal Framework

##### a.  Section 11

Section 11 imposes liability in the event that a registration statement, upon becoming effective, "contained an untrue statement of material fact," "omitted to state a material fact required to be stated therein," or "omitted to state a material fact . . . necessary to make the statements therein not misleading."  15 U.S.C. § 77k.  An issuer is strictly liable under a Section 11 claim, while officers, directors and underwriters may raise the affirmative defense of reasonable investigation (a standard that varies depending upon the individual's level of expertise and the subject matter of the statements).  Id. § 77k(b)(3).

##### b.  Section 12(a)(2)

Section 12(a)(2) imposes liability on any person who offers or sells a security by means of a prospectus or oral communication that "includes an untrue statement of material fact" or "omits to state a material fact necessary in order to make the statements . . . not misleading."  15 U.S.C. § 77l(a)(2).

### c.   Section 15

Section 15 imposes joint and several liability on any person who, through stock ownership, agency or otherwise, controls any person liable under Section 11 or Section 12, unless the control person had no knowledge of or reasonable ground to believe in the existence of facts supporting the primary liability of the controlled person.  15 U.S.C. § 77o(a).  As with Section 20(a) liability under the Exchange Act, Section 15 liability under the Securities Act is secondary, triggered only to the extent primary liability first attaches to a "controlled person."  Id.

### 2.   Pleading Standard for Securities Claims

The Issuer, the Individual Defendants, and the Underwriters argue in their motions to dismiss that the Lead Plaintiff Pension Fund's Section 11 and Section 12 allegations "sound in fraud" and are therefore subject to Rule 9(b) requirements.  Issuer & Individual Defs.' Mem. 17-18; Underwriter Defs.' Mem. 7-11.  As this Court ruled from the bench on December 13, 2011, and subsequently stated in its Order of December 16, 2011 ("Order"), ECF No. 80, the Complaint as amended[12] does not sound in fraud, and therefore is subject only to the pleading requirements of

---

[12] In its Order, the Court instructed the Lead Plaintiff Pension Fund to amend the complaint explicitly to exclude the Underwriters from each allegation in Paragraphs 1 through 63 that implicates the Underwriters in any fraudulent activity.  Order 2. The Lead Plaintiff Pension Fund has complied satisfactorily with the Court's Order.  See Compl. 1 n.1.

Federal Rule of Civil Procedure 8.  This memorandum explains the
Court's reasoning.

Because fraud is not an element of a Section 11 or Section
12 claim, plaintiffs generally are not subjected to the
heightened pleading requirements of Rule 9(b).  The First
Circuit, however, has held that if the Section 11 and Section 12
allegations sound in fraud, the plaintiffs must abide by Rule
9(b) and plead facts with sufficient particularity.  Shaw, 82
F.3d at 1222-23.  The First Circuit explained that "[i]t is the
allegation of fraud, not the 'title' of the claim that brings the
policy concerns [underlying Rule 9(b)] . . . to the forefront."
Id. at 1223 (citation omitted) (internal quotation marks
omitted).  As seems to be the case with most securities law,
there is no bright line rule to determine when allegations sound
in fraud.  Importantly, as this Court stated in In re Number Nine
Visual Technology Corp. Sec. Litig., 51 F. Supp. 2d 1, 12 (D.
Mass 1999), "courts must ensure [Section 11 claims] truly do
'sound in fraud' before the heightened pleading standard
associated with [10b-5 claims] attaches."

   a.  **The Structure of the Complaint and Language
        of the Allegations**

It seems to be a general pattern that a combination of the
following flaws are present in the cases which hold that
Securities Act allegations sound in fraud: (1) the complaint
contains merely a blanket disclaimer that the plaintiffs do not

allege fraud for the purposes of the Securities Act claims; (2)
the allegations themselves include classic fraud language; (3)
the complaint does not show any basis for the claims that is non-
fraudulent; and (4) the plaintiffs do not separate the factual
allegations supporting the fraud claims and negligence claims,
but rather require the courts to parse the complaints.  See,
e.g., Rombach v. Chang, 355 F.3d 164, 171-72 (2d Cir. 2004)
(holding the allegations sounded in fraud because plaintiffs made
only a blanket disclaimer, while the gravamen of the complaint
wss based on fraud, the allegations utilized words "classically
associated with fraud," and no non-fraudulent basis was put forth
for the Securities Act claims); In re Brooks Automation, Inc.
Sec. Litig., No. 06-11068, 2007 WL 4754051, at *14 (D. Mass. Nov.
6, 2007) (Zobel, J.) (holding that although plaintiffs inserted a
blanket disclaimer and carefully selected which paragraphs from
the complaint to incorporate into their allegations, the
Securities Act claims still sounded in fraud because the
allegations were worded with "classically fraud language" such as
"artificially inflated," "falsely reported," and "wrongful
conduct"); In re Sonus Networks, Inc. Sec. Litig., No. Civ.A.04-
10294-DPW, 2006 WL 1308165, at *6-7 (D. Mass. May 10, 2006)
(Woodlock, J.) (holding that the Securities Act allegations
sounded in fraud because the complaint had only a blanket
disclaimer, provided no non-fraudulent basis for the allegations,

and incorporated all of the factual allegations underlying the Exchange Act claims, including scienter); Stumpf v. Garvey, Nos. 03-CV-1352-PB, 02-MDL-1335-PB, 2005 WL 2127674, at *17 (D.N.H. Sept. 2, 2005) (holding that "fraud [was] at the very heart of the allegations," despite a blanket disclaimer, because the plaintiffs alleged the defendants deliberately misrepresented projections and instructed others to do the same).

The Lead Plaintiff Pension Fund's Complaint is distinguishable from the allegations in the above-cited cases. While the Complaint does include a disclaimer stating, "For purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent," Compl. ¶¶ 185, 195, it does not solely rely on this disclaimer to segregate its negligence allegations from its fraud allegations.  The Complaint has a separate section setting forth the factual allegations supporting the Securities Act claims on a non-fraudulent basis, id. ¶¶ 164-183, and only incorporates in Count Three (Section 11) and Count Four (Section 12) these Securities Act allegations, along with paragraphs 1 and 17-45, relating to jurisdiction and venue, and class action allegations. Id. ¶¶ 184, 194.

The Lead Plaintiff Pension Fund's Complaint seems to pass muster under cases holding that the Securities Act claims do not

sound in fraud.  See City of Roseville's Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d. 395, 424 (S.D.N.Y. 2011) (holding that the plaintiffs went beyond a "pro forma repudiation of a fraud theory," in that they framed their allegations in terms of negligence, provided a basis for those claims that defendants breached their duty to investigate the truth of the statements in the registration statement, and separated the scienter allegations in a distinct section of the complaint); In re Refco, Inc. Sec. Litig, 503 F. Supp. 2d 611, 631-32 (S.D.N.Y. 2007) (holding that the allegations did not sound in fraud as the complaint was "carefully structured so as to draw a clear distinction between negligence and fraud claims," the defendant's intent was "carefully couched in the language of negligence," and a non-fraudulent basis was provided for the negligence allegations); see also Fox v. First Bancorp, No. 05-2148 (GAG), 2006 WL 4128534, at *4 (D.P.R. Nov. 6, 2006) (holding that the disclaimer sufficiently prevented the allegations from sounding in fraud).

### b. The Usage of "Materially False and Misleading" and Similar Phrases

The Underwriters argue in their motion to dismiss that, according to the jurisprudence of the Second Circuit in Rombach, the Lead Plaintiff Pension Fund's allegations that the financial statements were "materially false and misleading" and that the registration statement and Second Quarter Form 10-Q contained

"inaccurate statements of material fact," are "classically
associated with fraud."  Underwriter Defs.' Mem. 10 (citing
Rombach, 355 F.3d at 172).  In Rombach, the Second Circuit held
that the wording of the complaint was "classically associated
with fraud" in accusations that the registration statement was
"inaccurate and misleading," that it contained "untrue statements
of material fact," and that "materially false and misleading
statements" were released.  Rombach, 355 F.3d at 172 (emphasis
omitted).[13]

As a preliminary matter, Rombach is a Second Circuit
decision and therefore not binding on this Court.  Moreover, even
district courts subject to Rombach have sought to avoid its
precedential implications, "because applied literally, it would
seem to require applying a 9(b) standard to all claims under §
11."  E.g., In re Refco, 503 F. Supp. 2d at 631.  This is so
because the language quoted by the Second Circuit (similar to the
language employed by the Lead Plaintiff Pension Fund) tracks the

---

[13] The Underwriters also cite In re Brooks, 2007 WL 4754051,
for the proposition that such language is "classically fraud
language."  Underwriter Defs.' Reply 4.  While the court in In re
Brooks included the phrase "false statements" in its description
of the classic fraud language in the complaint, the court also
cited myriad phrases that much more explicitly invoked fraudulent
conduct, such as "artificially inflated," "improper stock option
grants," and "wrongful conduct."  2007 WL 4754051, at *14.  Even
with this language, the court described it as a "close question"
whether the claims sounded in fraud.  Id.  As such, In re Brooks
does not support the Underwriters' argument that the Section 11
and Section 12 claims in the Complaint sound in fraud; indeed,
the case may cut against it.

language of Section 11 itself.  As the <u>In re Refco</u> court
asserted, "the mere fact that a statement is misleading (as are
all false statements, whether intentionally, negligently or
innocently made) does not make it fraudulent."  <u>Id.</u> at 632.
Thus, the words used by the Lead Plaintiff Pension Fund such as
"materially misleading" and "inaccurate" by themselves do not
transform a negligence-based claim into a fraud-based claim.

     **c.    The Usage of "Knew or Should Have Known"**

     The Issuer and Individual Defendants, <u>see</u> Issuer &
Individual Defs.' Mem. 17-18, and the Underwriters, <u>see</u>
Underwriter Defs.' Mem. 9-10, argue in their motions to dismiss
that the Securities Act claims sound in fraud in that the Lead
Plaintiff Pension Fund alleges that the "Defendants knew or
negligently ignored" that the Issuer should have used a cash-
based method of accounting, Compl. ¶  179, "[t]he Second Quarter
10-Q also contained knowing or negligent misrepresentations," <u>id.</u>
¶ 181, "Defendants knew or negligently ignored" that the Issuer
"lacked adequate internal and financial controls," <u>id.</u> ¶ 183, and
that, in the exercise of reasonable care, "the Individual
Defendants knew or should have known of the material
misstatements and omissions" in the Secondary Offering materials,
<u>id</u>. ¶ 189.  The defendants claim that such allegations suggest
knowing falsity and invoke Rule 9(b)'s heightened pleading

standards.[14]

The Underwriters cite <u>In re Stratosphere Corp. Securities</u>
<u>Litigation</u>, No. CV-S-96-708-PMP, 1997 WL 581032, at *8 (D. Nev.
May 20, 1997), which states that "[p]laintiffs cannot avoid the
more stringent requirements of Rule 9(b) by . . . try[ing] to
plead both fraud and negligence by stating Defendants 'knew or
should have known' of the alleged falsity."  The court also
stated, however, that all the allegations in the complaint
"concern[ed] the fraudulent concealment or misrepresentation of
material information," and that "[e]ach of Plaintiffs' claims are
grounded in fraud, by alleging the Defendants knew of [the
company's] true financial condition, yet purposefully issued

_____

[14] The Issuer and Individual Defendants argue in their motion
to dismiss that this Court previously held in <u>Number Nine</u>, 51 F.
Supp. 2d at 13, that "allegations that defendants '<u>knew</u> the false
or misleading character of their statements' subject those claims
to the strictures of Rule 9(b)."  Issuer & Individual Defs.' Mem.
17.  The Underwriters took a more nuanced approach to their
analysis of the case, pointing out that <u>Number Nine</u> is
distinguishable in that the plaintiffs there did not allege that
the defendants "knew" the false or misleading nature of their
statements, Underwriter Defs.' Mem. 10-11, but admitting that
this Court "found that the disclaimer . . . was sufficient to
avoid the requirements of Rule 9(b)," Underwriter Defs.' Reply 3.
A careful reading of this Court's decision in <u>Number Nine</u> shows
that the Court enumerated "two <u>alternative</u> reasons" for holding
that the complaint did not sound in fraud. <u>Number Nine</u>, 51 F.
Supp. 2d at 12.  The first reason provided by the Court was that
the disclaimer was "effective to prevent the Securities Act
claims" from sounding in fraud; the second (independent) reason
was that the allegations "appear[ed] to contend only that there
was a negligent or even innocent misrepresentation" and did not
allege that the defendants "knew" the false or misleading
character of their statements. <u>Id.</u> at 13.

optimistic and false statements."   Id.

The Complaint in this case is distinguishable from that in In re Stratosphere.   The present Complaint lists separate allegations supporting its negligence claims, see ¶¶ 164-183, and bases its Section 11 and Section 12 counts on separate duties for each class of defendants.   The counts against the Issuer are based on strict liability.   Id. ¶ 188.   The counts against the Individual Defendants are based on a breach of a duty to make a "reasonable and diligent investigation of the truthfulness and accuracy" of the Secondary Offering materials, id. ¶ 189, and the counts against the Underwriters are based on the breach of a duty "to investigate with due diligence the representations contained" in the Secondary Offering materials, id. ¶ 190.

In a recent decision from the Southern District of Texas, the court held that "the [plaintiffs'] allegations that [the underwriter] 'knew or should have known' that the statements were untrue did not transpose the Section 11 claim into one sounding in fraud."   In re Franklin Bank Corp. Sec. Litig., 782 F. Supp. 2d 364, 403 (S.D. Tex. 2011).   The court went on to explain that "[f]raud encompasses a particular state of mind, an element of intent or deception, which is absent in the [plaintiff's] allegations against [the underwriters]."   Id.   The court also found persuasive that the complaint specifically disclaimed that the Section 11 claim "does not sound in fraud."   Id.

48

Similarly, in <u>In re Children's Place Securities Litigation</u>, the court interpreted the plaintiffs allegations of "knew or should have known" to mean "possessed, or should have possessed" the information that the plaintiffs allege was omitted or misrepresented.  <u>In re Children's Place Sec. Litig.</u>, No. CIVA 97-5021 JCL, 1998 WL 35167284, at *4 (D.N.J. Sept. 4, 1998).  The court held that "[t]hese allegations cannot be thought to constitute 'averments' of fraud,' absent any claim of scienter or reliance. . . . Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b)."  <u>Id.</u>[15]

This Court is persuaded that the language employed by the Lead Plaintiff Pension Fund, "Defendants knew or negligently ignored," does not constitute an averment of fraud.

### d.   Allegations of Fraud in the Background Section of the Amended Complaint

The Underwriters further argue that the Lead Plaintiff Pension Fund's allegations are based in fraud in that the amended complaint does not expressly exclude the Underwriters from an

---

[15] Additionally, in <u>Fox</u>, 2006 WL 4128534, the court declined to apply Rule 9(b) pleading requirements because the plaintiff's complaint "expressly disclaimed any allegations that sound in fraud," even though the complaint contained allegations in its Section 11 count such as "Defendants knew, or in the exercise of reasonable care should have known."  Am. Class Action Compl. ¶ 272, <u>Fox</u>, 2006 WL 4128534 (No. 05-2148).  The court - without addressing this language - held that the Section 11 claim did not sound in fraud and analyzed the allegations pursuant only to Rule 8(a).  <u>Fox</u>, 2006 WL 4128534, at *4.

earlier narrative section of the amended complaint, specifically paragraphs 1-63, that makes generalized allegations such as "Defendants' fraudulent scheme enabled [the Issuer] to report record revenues and financial results during the Class Period," Compl. ¶ 5, "Defendants' scheme enabled [the Issuer] to raise $163 million in proceeds in a Secondary Offering," id. ¶ 6, and "Defendants' scheme began to unravel on April 5, 2011," id. ¶ 10. Underwriter Defs.' Mem. 8-9.

The Court already addressed this matter in its Order of December 16, 2011, instructing the Lead Plaintiff Pension Fund to amend the complaint explicitly to exclude the Underwriters from each allegation in Paragraphs 1 through 63 that implicates the Underwriters in any fraudulent activity.  Order 2.  The Lead Plaintiff Pension Fund has complied satisfactorily with the Court's Order.  See Compl. 1 n.1.

### 3. Claims Against the Issuer and Individual Defendants

The Issuer and Individual Defendants do not dispute that the Complaint satisfies the standards of Rule 8.  As such, the Court denied Issuer and Individual Defendants' motion to dismiss the Securities Act claims under Section 11, Section 12(a)(2) and Section 15 (Counts Three, Four and Five) in its previous Order of December 16, 2011.  Order 1.

### 4. Claims Against the Underwriters

As the Court has just held, the Securities Act claims are

not subject to the pleading requirements of Rule 9(b) as they do not sound in fraud.  Nor are the claims subject to the heightened pleading requirements of the PSLRA, as the PSLRA applies to "any private action arising under this chapter," 15 U.S.C. § 78u-4(b)(1), i.e., the Exchange Act.  There is no parallel provision in the Securities Act.  Thus, to survive a motion to dismiss, the Lead Plaintiff Pension Fund's claims under Section 11 and Section 12 need only meet the pleading standards of Rule 8 and the requirements of Twombly, 550 U.S. at 570.

The Lead Plaintiff Pension Fund alleges that the financial statements contained in the second quarter Form 10-Q, which were incorporated by reference in the Registration Statement, were materially false and misleading.  Compl. ¶¶ 178-180.  The Complaint references the Issuer's subsequent restatement of revenue for the second fiscal quarter and its admission that revenues were recorded for certain shipments to Chinese customers other than Sinovel before collectability was reasonably assured. Id. ¶¶ 179-180.  The Issuer disclosed that it had overstated revenue for the second quarter by approximately 4%, and operating income for the second quarter by approximately 10%.  Id. ¶ 180.

Pursuant to GAAP, a company must restate its revenue to correct material accounting errors in previously-issued financial statements.  ASC 250-10-20.  "Although a restatement is not an admission of wrongdoing, the mere fact that financial results

51

were restated is sufficient basis for pleading that those
statements were false when made." In re Atlas Air Worldwide
Holdings Inc. Sec. Litig., 324 F. Supp. 2d 474, 486-87 (S.D.N.Y.
2004) (citing In re Cylink Sec. Litig., 178 F. Supp. 2d 1077,
1084 (N.D. Cal. 2001) (holding that "the mere fact that
[financial] statements were restated at all supports . . . an
inference" of falsity at the pleading stage)); see also Warchol
v. Green Mountain Coffee Roasters, Inc., No. 2:10-cv-227, 2012 WL
256099, at *4 (D. Vt. Jan 27, 2012) ("[T]here is little debate
that the [financial statements] . . . were false - [the issuer]
admitted as much in restating them.").  The Lead Plaintiff
Pension Fund thus sufficiently has alleged a misstatement in the
second fiscal quarter Form 10-Q incorporated by reference into
the Registration Statement.

Unlike Rule 9(b) and the PSLRA, which oblige the Court to
examine each alleged misstatement or omission to ensure it is
pled with sufficient particularity, Twombly only requires that
the Court identify sufficient factual allegations, accepted as
true, that "state a claim to relief that is plausible on its
face." Twombly, 550 U.S. at 570.  Because the Court holds that
the Lead Plaintiff Pension Fund has adequately alleged a
violation of Section 11 and Section 12(a)(2) based on the
inaccurate financial statements for the second fiscal quarter
incorporated into the Registration Statement, the Court need not

inquire further into the Lead Plaintiff Pension Fund's additional allegations of misstatements or omissions in the Registration Statement.[16]

### III.   CONCLUSION

For the foregoing reasons:

The Issuer and Individual Defendants' motion to dismiss the Exchange Act claims (Counts One and Two) is GRANTED;[17]

The Underwriters' motion to dismiss the Securities Act claims (Counts Three and Four) is DENIED.[18]

This case perfectly exemplifies the fact that statutes do matter.   The PSLRA, passed during a period of hyperinflation of

---

[16] Lead Plaintiff Pension Fund is not entitled to more damages if it shows multiple misstatements or omissions in the Registration Statement.   Rather, the measure of damages for a violation of Section 11 is the difference between the amount paid for the security (not to exceed the offering price) and either (1) the security's value at the time of the suit (if not yet sold), (2) the consideration received for the security (if sold before the suit), or (3) the consideration received for the security (if sold after the suit, but before judgment, provided that damages under (3) provides a lesser measure than under (1)). 15 U.S.C. § 77k(e).   The measure of damages for a violation of Section 12(a)(2) is rescission, if the security is not yet sold (that is, consideration paid for the security less any income received thereon), or, if sold, the difference between the purchase price and the sales price.   15 U.S.C. § 77l(a).

[17] The Court dismisses the Exchange Act claims WITHOUT PREJUDICE.   The Lead Plaintiff Pension Fund may move for leave to amend the Complaint should discovery enable it to supplement its claims with more particularized factual allegations that remedy the weaknesses discussed herein.

[18] As this Court previously held, the Issuer and Individual Defendants' motion to dismiss the Securities Act claims (Counts Three, Four, and Five) is DENIED.   Order 2.

stock value (at least on paper), was intended to protect
corporate officers from groundless suits.  Here it may possibly
shield such officers from discovery of wrongdoing.  The
protection of corporate officers was not a legislative goal of
the Securities Act, passed during the Great Depression.  That
part of the case may press forward.  The result is an interesting
end run around the discovery bar of the PSLRA.

The parties shall, within thirty days of the date of this
order, submit a proposed case management schedule.

**SO ORDERED.**

 /s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE